# Bragg *v.* The State.

*Indictment for Practicing Medicine without Certificate of Qualification.*

1. *Construction of statutes; interpretation of technical words; practicing medicine.*—"Medicine" or "practicing medicine," as used in the statutes in this State in reference thereto, are technical words used in reference to an art or science, and must, therefore, be interpreted, not according to their mere ordinary general meaning, but according to the meaning or use they have when applied to the particular art or science in reference to which they are used.

2. *Same; same; same.*—"Medicine," as used in the statutes of this State pertaining to the regulation of the practice of medicine, has a technical meaning, and as a science, the practitioners of it are not simply those who prescribe drugs or other medicinal substances as remedial agents, but are those who diagnose disease and prescribe or apply any therapeutic agent for its cure.

3. *Statute requiring practitioners of medicine to obtain certificate of qualification, includes those practicing Osteopathy.* The statute which makes it unlawful for any person to practice "medicine or surgery without having first obtained a

[Bragg v. The State.]

certificate of qualification from one of the authorized boards of medical examiners of this State," embraces those who practice Osteopathy, which as a science or art includes the diagnosis of disease and the treatment thereof by a system of manipulation of the limbs and body of the patient, with the hands, by kneading, rubbing or pressing upon the different parts of the body.

4. *Statute regulating practice of medicine; constitutional.*—The legislation of the State pertaining to and regulating the practice of medicine in this State is a valid exercise of the police powers of the State, and is constitutional.

APPEAL from the Criminal Court of Jefferson.

Tried before the Hon. SAMUEL E. GREENE.

The prosecution of the appellant in this case was commenced by an affidavit made before the judge of the criminal court of Jefferson county, which charged: "That E. Eugene Bragg, within twelve months before the making of this affidavit in said county, as a profession or as a means of livelihood did practice medicine without first having obtained a certificate of qualification from one of the authorized boards of medical examiners of this State, against the peace and dignity of the State of Alabama."

The cause was tried by the court without the intervention of a jury upon an agreed statement of facts, in which it was admitted that the defendant, within twelve months before the commencement of the prosecution, practiced in Jefferson county, Alabama, what is commonly known as Osteopathy, without first having obtained a certificate of qualification from one of the authorized boards of medical examiners of this State; that he practiced the same as a profession and means of livelihood; that Osteopathy is a new method of treating diseases, commonly said and understood to have originated with one Dr. A. T. Still, of Kirksville, Mo., about the year 1871; that said Dr. Still practiced Osteopathy until about the year 1890, when he established a school for instruction therein; that said school has subsequently grown until it is now a chartered college. The agreed statement of facts then set out the further following facts: "The defendant was regularly educated

in and graduated from the said college which has the
name of the American School of Osteopathy, and holds
a diploma from that institution certifying his capacity
and fitness for the practice of Osteopathy. The method
of treatment by the practitioners of Osteopathy is a sys-
tem of manipulation of the limbs and body of the pa-
tient with the hands, by kneading, rubbing or pressing
upon the parts of the body. In the treatment, no drug,
medicine or other substance is administered or applied,
either internally or externally; nor is the knife used or
any form of surgery resorted to in the treatment. The
practitioner himself performs the manipulations. The
teaching and theory of those skilled in Osteopathy are,
that it is a system of treatment of disease by adjustment
of all the parts of the body mechanically. It is taught
that any minute or gross derangement of bony parts;
contracting and hardening of muscles or other tissues; or
other mechanical derangements of the anatomical parts
of the body which must be in perfect order mechanically,
in order that it may perform its function aright, nerve
centers, arteries, veins and lymphatics, which must func-
tion properly in order that health may be maintained.
It is taught that such interferences lend to congestion,
obstructed circulation of blood and lymph, irritation of
nerves and abnormal state of nerve centers; that the
result is disease which can be cured only by righting
what is mechanically wrong. In other words, it is
taught that in health the adjustment of the various
parts of the body is perfect; in disease this relation is
disturbed; e. g., if a muscle becomes contracted it will
impinge on neighboring structures; also the force ex-
erted thereby may produce a tension which tends to dis-
place the bones to which it is attached. The circulation
is impeded, lowered vitality resulting. Osteopathic
treatment, it is taught, overcomes contractured condi-
tions of the muscles, stimulates the nerve centers -to
greater activity and increases the circulation to the
parts by mechanical means without the aid of any sort
of medication. And it is claimed and taught that when
any slight bony lesion causes interference with the func-
tion of the parts, Osteopathic manipulations will re-
move the cause and cure the trouble. The essential

[Bragg v. The State.]

things taught in the schools of Osteopathy are anatomy, physiology, hygiene, histology, pathology and the treatment of diseases by manipulation. The repudiation of drugs and medicine in the treatment of diseases is a basic principle of Osteopathy and a knowledge of drugs or medicines, their administration for the cure of diseases, the writing and giving of prescriptions, are not essential to the graduation of, and the issuance of diplomas to, students of Osteopathy. It was in pursuance of, and in accordance with the foregoing principles, rules, and practices, that the defendant practiced Osteopathy as hereinbefore admitted and not otherwise; and in his practice he never at any time used or prescribed any drug or medicine of any kind, but his practice consisted entirely of manipulations of the body and limbs of the patient performed by himself. He never held himself out to the public to practice in any other way. It is admitted that physicians engaging in the practice of the regular system of medicine have never treated patients by the manipulations of the body and limbs. It is further admitted that the defendant in said county of Jefferson, and within twelve months before the commencement of the prosecution, kept and maintained an office, where he invited persons afflicted with disease to consult him and receive treatment from him during his office hours, and he called upon and treated patients at their home, and that he published and circulated literature inviting sufferers to consult him and setting forth the superiority and efficacy of his treatment of disease, using his system of treatment herein described, and that he is and was called by the title of Doctor, and that he received and charged a fee for his service and treatment. and that he has never applied to be examined or to have a certificate of qualification from any of the authorized boards of medical examiners of this State. It is further admitted that there is and has been for many years since 1873, county Medical Societies organized under and in affiliation with the State Medical Association of the State of Alabama, in the county of Jefferson, and a large number of other counties of Alabama."

[Bragg v. The State.]

There was also introduced in evidence the constitution of the Medical Association of the State, and the ordinances and laws for the government of said Association.

On the hearing of all the evidence, the court rendered judgment finding the defendant guilty as charged in the affidavit, and assessing a fine of $25 and costs against him. To the rendition of this judgment the defendant duly excepted, and from this judgment he brings the present appeal.

JAS. B. HEAD and B. M.ALLEN, for appellant.—A statute requiring a person to have a certificate from the board of medical registration (under a similar statute to ours) before prescribing, directing or recommending any drug, medicine or other agency for the treatment cure or relief of any bodily infirmities, does not include an Osteopath.—*Nelson v. State Board of Health,* (Ky. 1900) 57 S. W. Rep. 501; 50 L. R. A. 383; *State v. Liffring,* 61 Ohio St. 39; 46 L. R. A. 334; *State v. Mylord,* 40 Atlantic 750 (Rhode Island); *Smith v. Lane,* 24 Hun. 632 (New York).

A similar statute has been held not to include the system known as "Christian Science."—*Evans v. State,* 9 Ohio S. & C. P. Dec. (Ohio 1899) 222; No. 1953 Central Law Journal, Editorial page 361.

If there is any doubt in the mind of the court as to the construction of a statute, that doubt should be resolved in favor of the defendant. There are three reasons for this: First, because the statute is penal; second, because the offense created by it is purely statutory, unknown to the common law, and is a restriction upon the liberty of this citizen to follow his trade or profession in his own way; and, third, because it is not levelled against an offense which is in itself evil or vicious, but illegal simply because it is prohibited.—*State v. Brooks,* 88 Ala. 122.

It is a well settled rule of law that penal statutes are to be construed strictly.—*State v. Powers,* 36 Conn. 77; 23 Am. & Eng. Ency. Law (1st ed.), pp. 374, 375, 376, 377 and note.

CHAS. G. BROWN, Attorney-General, and CABANISS & WEAKLEY, for the State.—1.   Section 5333 (Criminal Code) and section 3621 (Civil Code) are constitutional. *Bell v. State*, 104 Ala. 79; *Brooks v. State*, 88 Ala. 122; *Nicholson v. State*, 100 Ala. 132.

2.   The words "persons practicing medicine" are synonymous with the word "physician."—*Harrison v. State*, 102 Ala. 470.

3.   A person is "practicing medicine" who is practicing "the healing art"—that is, who holds himself out as competent to diagnose and cure disease—although he may not administer drugs; hence, one who practices the system of Osteopathy, in the manner as shown in the agreed statement of facts, is a physician, and a practitioner of "medicine" within the meaning of the statutes on which this prosecution is based.—*Bibber v. Simpson*, 59 Me. 181; *Hewitt v. Charier*, 16 Pick. (Mass.) 353; *Little v. State*, 51 L. R. A. 717; 84 N. W. 248; 60 Neb. 749; *Eastman v. People*, 71 Ill. App. 236; *Jones v. People*, 84 Ill App. 453; *People v. Jones*, 92 Ill. App. 446; *Davidson v. Buhlman*, 37 Mo. App. 576; *Benham v. State*, 116 Ind. 112; 18 N. E. 454; *State v. Buswell* (Neb.) 24 L. R. A. 68; *Nelson v. Harrington*, 1 L. R. A. 719; *People v. Gordon*, (Ill. Sup.) 62 N. E.858; *State v. Gravett*, (Ohio) 62 N. E. 235; *People v. Harding*, 10 Col. 387; 17 Pac. 727.

TYSON, J.—It is admitted that defendant was engaged in the practice of osteopathy as a profession and means of livelihood without having obtained a certificate of qualification from one of the authorized boards of medical examiners.

The most important question presented is whether the practice of osteopathy is "the practice of medicine in any of its branches or departments," within the meaning of section 3261 of the Civil Code and 5333 of the Criminal Code.   The contention of defendant is, that it is not.   He predicates his insistence mainly, indeed, we may say wholly, upon the fact that in the practice of osteopathy no drugs or other medicinal substances are administered or applied, internally or externally; nor

is the knife used or any form of surgery resorted to in the treatment of diseases. In fact, the practitioners of that school of the healing art repudiate as remedial agents all drugs, medicinal substances and the knife and other surgical instruments and appliances, in the treatment of or allievation of diseases and, therefore, need have no knowledge of their use. They, of consequence, know nothing of the medicinal properties of drugs and other medicinal substance, or of the compounding and administering of drugs in the cure of diseases. Their method of treatment is entirely external, consisting of "a system of manipulation of the limbs and body of the patient with the hands, by kneading, rubbing or pressing upon the parts of the body." However, in order to practice the profession of osteopathy skillfully and scientifically, it is admitted, that the practitioner must know anatomy, physiology, hygiene, histology and pathology. Confessedly, the requirement of a knowledge on the part of the practitioners of all of these branches of the science of healing the sick or diseased is to enable him to skillfully determine the disease with which his patient is afflicted and to aid him in making a proper application of his system of manipulation. For, it is entirely clear from the evidence that the practitioner does not make the same application of his remedy to all diseases, but that he applies such system of manipulation as is most remedial in alleviating or curing the particular disease he is called upon to treat. In other words, after a diagnosis of the disease of the patient, he applies the remedy most suitable to its cure, confining it, however, to his system of manipulation as a remedial agent.

So, too, a practitioner of medicine is required to know anatomy, physiology, hygiene, histology, and pathology, in order to enable him to skillfully and scientifically determine from what disease his patient is suffering, and after so determining he must also know how and what remedial agents should be prescribed for the alleviation or cure of the disease. So, after all, the only difference between the two is in the matter of therapeutics—that branch of medical science which considers the application of remedies as a means of cure. The former, as we have shown, applies his external remedies exclusively,

while the latter prescribes internal or external, or both, as the exigencies of the case may require. The result sought to be accomplished by each is the same—to relieve the patient's illness—to cure him. Both are practicing the art of healing or curing human diseases.

But, it is said the words "the practice of medicine" or "who practices medicine," as used in the statutes, should not be extended to all practitioners of the art or science of healing or curing diseases, but that their proper interpretation or construction includes only those persons who employ medicinal substances or drugs as remedial agents for the alleviation or healing of diseases. This contention is based upon the proposition, that the word "medicine," in its popular sense and as commonly understood, is a remedial substance or drug; and that the practice of medicine, as popularly understood, inseparably includes as its great and overruling constituent the administration of drugs and other medicinal substances as remedial agents. Indeed, the whole superstructure of defendant's theory, that as a practitioner of osteopathy he is not engaged in the practice of medicine, has for its foundation that the interpretation of the words "medicine" or "practice of medicine" must be accepted in the sense in which these words are commonly used. With this foundation or base destroyed, his theory must fall. In other words, if his premise is shown to be fallacious, of necessity his conclusion must be false. So, then, the question is, what is the correct rule of interpretation of these words? Shall we interpret them in their popular sense or as commonly understood, or are they to be interpreted, being technical words, used in reference to a technical subject, according to the meaning or use they have when applied to the particular art or science with reference to which they are used? It can not be well doubted that if they are technical words, having a technical meaning, when applied to the particular art or science to which they refer, that such use or meaning must be given to them, unless, from the context of the statutes, a different use or meaning is made apparent.—17 Am. & Eng. Ency. Law, (2d ed.), 13; 23 Am. & Eng. Ency. Law, (1st ed.), 324. This rule is stated by Mr. Endlich in his work on the Interpreta-

[Bragg v. The State.]

tion of Statutes, (secs. 73, 74 and 75, pp. 94, 95 and 96), to be that "the words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object which the legislature has in view. Their meaning is found not so much in a strictly grammatical or etymological propriety of language, nor even in its popular use, as in the subject or in the occasion on which they are used, and the object to be attained. That is, in the construction of a statute, as in that of other instruments, words are to be understood, not according to their mere ordinary general meanings, but according to their ordinary meaning as applied to the subject matter with regard to which they are used, unless, indeed, there be something requiring them to be read in a sense which is not their ordinary sense in the English language as so applied. * * * An obvious result of this rule is, that where technical words are used in reference to a technical subject, they are primarily interpreted in the sense in which they are understood in the science, art or business in which they have acquired it." After showing the application of the rule in the construction of words and phrases having legal technical meanings, the author continues by saying: "But the rule giving to a word its technical meaning holds equally good in the construction of statutes dealing with other subjects as to which words and phrases used in a statute have acquired such a meaning, whether it be a legal technical meaning or not; i. e., whether it be a technical meaning which the word or phrase has acquired in the law, or a technical meaning which it has acquired in any other science, art, or business, if the enactment relates to any of these, the technical meaning the word has in the law, in any other science, in any art, or in any business, is to be given to it, acordingly as the one or the other is the subject of the enactment."

It will not be doubted that the word "medicine," however, whenever and wherever used, has reference to the subject of a science or art, a technical word denoting the science or art of curing diseases; and that one who engages in the practice of it is a scientist or artist, professionally known by the name of "physician" or doctor." It may be, and doubtless is, true that it is not and has never

been an exact science, but this is due to the fact that it has been and is a progressive science—but it is, nevertheless, a science or art. Nor does the fact that those who practice the science or art differ as to the administration of specific remedies for specific diseases render it any the less an art or science. These differences have always existed, and will, doubtless, always continue to exist.

The word "medicine" (Latin, *medicina*,) is derived from *medeor*—to heal. It is defined by the eminent lexicographer of medical words or terms, Gould, to be: "The science and art of preserving health, and preventing and curing disease; the 'healing art,' including also the science of obstetrics;" by Dunglison, another author of a medical dictionary, to be: "The healing art; physic. A science, the object of which is the cure of disease and the preservation of health." Bigelow, an eminent physician and author of medical works, says: "Medicine is the art of understanding diseases and curing or relieving them, when possible." The Universal Cyclopedia, edited by Rossiter Johnson, Ph. D., L. L. D., after giving the derivation of the word "medicine" from the Latin word *"medicina,"* defines it to be "the art of a physician, or of healing; the art and science of curing diseases." The Encyclopedia Britannica, under the title, "Medicine," sub-title, "Synoptical view of Medicine," says: "Medicine, the subject matter of one of the learned professions, includes as it now stands, a wide range of scientific knowledge and practical skill. * * * The science of medicine is the theory of disease and remedies."

Definitions might be quoted from other writers, but these will suffice to show not only the word "medicine" is a technical word, denoting a science or art, comprehending not only therapeutics, but the art of understanding the nature of diseases, the causes that produce them, as well as the art of knowing how to prevent them, hygiene, sanitation, and the like. These definitions are fully supported and their correctness thoroughly established by the history of medicine, and its practice as a science or art.

While it is true, as we said above, there has always existed differences among physicians as to the therapeutic agencies that should be employed in the treatment of diseases, yet it has never been supposed that the disciples of any particular school of the healing art were physicians, practitioners of medicine, and those of a different school or sect were not. They have all been regarded by eminent scholars as engaged in the practice of medicine. Doubtless, these differences have produced much good, caused advancement in the art, tended to perfect the science, and have given to the profession a broader and more enlightened view or insight into this great science.

Dr. Roswell Park, in his Epitome of the History of Medicine, speaks of the origin of medicine as having been nearly contemporaneous with the origin of civilization. He points out that the earliest records of probable authenticity are perhaps to be met with in the scriptures, from which may be gathered here and there a fair notion of Egyptian knowledge and practice. Thus, we read in the 50th chapter of Genesis, that "Joseph commanded his servants, the physicians, to embalm his father; and the physicians embalmed Israel." He also speaks of medicine as the healing art, and traces the practice of it among the Greeks to Aesculapius, who, he says, was the leading character in medicine of all the ancients, with the possible exception of Hermes among the Egyptians. He shows that this great physician cured ulcers, wounds, fever, and pain of all who applied to him, by enchantments, potions, incisions, and by external applications. So renowned became the name of this illustrious physician, that temples were erected to his fame and in his honor, in which schools of medicine were established and the science taught. These temples existed for centuries and the schools were presided over by the priests, who treated all sick persons who repaired to or were conveyed to them. The sick person or his representative after ablution, prayer and a sacrifice, was made to sleep on the hide of a sacrificed animal or at the feet of the statue of the god, while sacred rights were performed. In his sleep the appropriate remedy was indicated by a dream. Moral or dietetic remedies were

more often prescribed than drugs. Thus it was that medicine as a science was practiced for centuries in Greece, prior to the advent of Hippocrates, (in the 4th century B. C.), to whom is credited the high conception of the duties and status of the physician as shown in his celebrated "Oath" and elsewhere in his writings— "equally free from the mysticism of a priesthood and the vulgar pretensions of a mercenary craft." By some writers, this great physician and philosopher is called the "father of physic." There can be but little doubt that he may be regarded as the founder of the medical profession; that it was by and through his teaching that medicine came to be a distinct art, disconnected and disassociated from sacerdotalism. He wrote many books on medicine, and yet he possessed but little knowledge of anatomy, physiology and pathology and absolutely knew nothing of chemical drugs. Indeed, he and his disciples attached but little importance to drugs as a therapeutic agent, but relied, in acute diseases, mainly upon diet, the variations necessary in its administration in different diseases being minutely defined. In the treatment of cases of chronic diseases, diet, exercise, and natural methods were chiefly relied upon. Indeed, in those days drugs as theraupetic agencies were of necessity of minor importance in the treatment of the sick, since they were few and since chemical drugs were not discovered until long afterwards, to-wit, about the fifteenth century. For several centuries the Hippocratic school of medicine, known as the dogmatist, prevailed, though there were opposing sects or schools. Succeeding the dogmatist was the school of medicine founded by Asclepiades, who, repudiating the Hippocratic doctrine, adopted hygienic remedies—for the most part bodily exercise. Gymnastic exercises, as was also massage, were fully recognized by the physicians of those days, and prescribed by them as therapeutic agents in the healing of diseases. So was water recognized as a scientific remedial agent—technically called Hydro-therapy. After the appearance of Galen, a great physician and scholar, who is supposed to have died about 200 A. D., at the age of seventy-one years, and who wrote many works on the science of medi-

cine, Europe for thirteen centuries seemed to have yielded to his authority. Indeed, to him the medical profession is indebted for much. Yet, in the revolutions of medical opinion, the works of this great man were publicly burned in the fourteenth century by Paracelsus and his disciples; and for centuries following the medical profession was divided between the Galenist and the chemist until a complete ascendency over both was obtained by the vitalist. Thus we see that no system of therapeutics has been uniformly followed and, perhaps, as we have said, never will be. Indeed, we might go further and show that at this day the regular practitioners of medicine, as they are known to the profession, recognize the efficaciousness of water, massage, electricity, and perhaps other external applications to the body as scientific therapeutic agencies. It may not be amiss in this connection to instance the "rest cure," a thoroughly recognized scientific treatment for mental or nervous troubles. It consists in keeping the patient quiet and at rest, giving to him occasionally a massage, an application of electricity, a sponge bath, with proper diet. No drug is used, except a laxative, occasionally, if necessary. The use of drugs, however, is a secondary consideration, and may be dispensed with altogether.

Thus it is made entirely clear both by definitions and history that the word "medicine" has a technical meaning, is a technical art or science, and as a science the practitioners of it are not simply those who prescribe drugs or other medicinal substances as remedial agents, but that it is broad enough to include and does include all persons who diagnose diseases and prescribe or apply any therapeutic agent for its cure.

Is there anything in the language of the statutes which prevents giving to the word "medicine" its legitimate technical use or meaning? This question can be best answered by tracing the history of the legislation on this subject, culminating in the present statutes. Before doing so, however, we should bring to mind the purpose of these enactments and constantly keep before us that the legislative purpose was to protect the public against charlatanism, ignorance and quackery.—*Brooks v. The State,* 88 Ala. 122. The first enactment on this subject

12c

was approved December 22, 1823, (Acts, 1823, p. 45), wherein it was provided that no person or persons shall be allowed to practice physic or surgery or any branch thereof *or in any case to prescribe for the cure of diseases* for fee or reward unless he shall be licensed to do so. That act also provided for the establishment of boards of physicians, whose duty it was to examine the applicant and to grant him the license. In 1832, persons practicing medicine on the Botanical system of Doctor Samuel Thompson were exempt from taking out a license. In 1841, it was made the duty of the medical boards to examine and license applicants to practice dental surgery, under the same rules and regulations and subject to the same restrictions, as those who apply for license to practice medicine, and a penalty was imposed upon any person styling himself a dentist or other person who engaged in the practice of dental surgery as a professional business without having been regularly licensed by one of the medical boards.—Clay's Dig. pp. 487, *et seq.* The substantial provisions of these enactments were embodied into the Code of 1852. However, in the adoption of that Code, there was added the requirement that all druggists should obtain a license to deal in drugs from the medical board of the county in which such business was pursued.—Code of 1852, § 980. Thus stood the law, with some few amendments which are not necessary to be here noticed, until the Act of February 9, 1877, (Acts, 1876-77, p. 80,) which committed the duty theretofore imposed alone upon the medical boards to the board of censors of the several county medical societies in connection with the board of censors of the Medical Association of the State of Alabama. No material change was made by this act with respect to the class of persons required to obtain a license to practice medicine, surgery, dentistry, or to sell drugs, except as to those persons who desired to practice some irregular system of medicine and females who practice midwifery. As to the irregular practitioners, they were prohibited from practicing their system of medicine in any of its branches or departments as a profession and means of livelihood without having obtained a diploma or certificate of qualification in anat-

omy, physiology, chemistry, and the mechanism of labor from some authorized board of medical examiners. Chap. 3 and 4 of Code of 1876, pp. 460-1. On the 11th day of February, 1881, a board of dental examiners was constituted whose duty it was to grant licenses to all dentists who may have received licenses from medical boards, without examination or fee, and to grant licenses to all other applicants who underwent a satisfactory examination, upon the payment of a fee of five dollars. Code of 1886, §§ 1296, et seq. In 1887 a board of pharmacy was established to examine every person desiring to conduct the business of selling at retail, compounding or dispensing drugs, medicines or chemicals for medicinal use, or compounding or dispensing as pharmacists prescriptions prepared by physicians. In 1895 every physician who was licensed to practice medicine was also authorized to fill prescriptions of other physicians, compound and sell medicines and poisons, and carry on the business of pharmacists. As far back as 1875, the Medical Association of the State of Alabama was constituted a board of health for the State, and to it was committed cognizance of the interest of health and life among the people of the State; and the duty imposed of investigating the causes and means of prevention of endemic and epidemic diseases; of investigating the influences of localities and employments upon the public health; of making to the law-making branch of the State such suggestions as to legislative action as, in their judgment, may seem advisable. This board of physicians were, in fact, constituted the medical advisers of the State.—Acts, 1874-5, p. 130; Code of 1876, §§ 1537 et seq.; Code of 1886, §§ 1260 et seq. And, at this writing, to this board is entrusted largely the enforcement of all laws relating to public health, quarantine and sanitation.—Code of 1896, §§ 2392 et seq.

Thus has been the growth and development of the law in this State regulating "the practice of medicine in any of its branches or deparments as a profession." From this growth and development, can it be seriously doubted that it was not the intention or purpose of the legislative mind to restrict the examination of those desir-

[Bragg v. The State.]

ing to practice medicine to that class of the profession who may prescribe drugs as therapeutic agents in the healing of diseases? We think not. On the contrary, the very first enactment on the subject (1823), prohibiting any person from prescribing for the cure of diseases for fee or reward without obtaining a license is a clear, unequivocal and unmistakable declaration of the legislative purpose to deal with medicine and the practice of it in its broad and comprehensive sense —as a science or art of healing and curing diseases. And this purpose has been rather emphasized than otherwise, in subsequent legislation on the subject.

Our conclusion, therefore, is that the defendant was engaged in the practice of medicine within the meaning of the statutes. This conclusion is fully supported by the decisions of other courts. In *Bibber v. Simpson,* 59 Maine, 181, APPLETON, C. J., speaking for the court, said: "The services rendered were medical in their character. True, the plaintiff does not call herself a physician, but she visits her sick patients, examines their condition, determines the nature of the disease, and prescribes the remedies deemed by her most appropriate. Whether the plaintiff calls herself a medical clairvoyant, or a clairvoyant physician, or a clear-seeing physician, matters little; assuredly, such services as the plaintiff claims to have rendered, purport to be and are to be deemed medical." So it was held that she was not entitled to recover for her services, she having no license to practice medicine.

In *Hewitt v. Charier,* 16 Pick. 353, it was held, SHAW, C. J., delivering the opinion, that "a person who practices bonesetting and reducing sprains, swellings and contractions of the sinews, by friction and fomentation, but no other branch of the healing art, is a person practising surgery, within the meaning of St. 1818, c. 113, § 1, which provides, that no person practising physic or surgery shall be entitled to the benefit of law for the recovery of his fees, unless he shall have been licensed by the Massachusetts Medical Society or graduated doctor in medicine in Harvard University."

In *Davidson v. Bohlman,* 37 Mo. App. 576, it was held that: "The statutes restricting the right to prac-

tice medicine and surgery to registered physicians and surgeons and requiring the filing of diplomas, apply to one who as a physician gives electric treatments; it is not necessary that one should administer internal remedies in order to practice medicine within the meaning of the statutes," which prohibited the practice or the attempt to practice medicine or surgery without first filing a diploma, etc.

The case of *Eastman v. The People,* 71 Ill. 236, is directly in point. The appellant there, as here, was engaged in the practice of osteopathy. The statute of Illinois defined practitioners of medicine in this language: "Any person shall be regarded as practicing medicine within the meaning of this act who shall treat, operate on or prescribe for any physical ailment of another." The Court after saying that the appellant "professes to be able to diagnose and advise in respect to a long list of diseases, and to furnish discriminating and efficient treatment to those who may come to him, and while he may rely wholly upon manipulation, flexing, rubbing, extension, etc., yet he professes to have skill and judgment in these methods, so as properly to adapt the treatment to each case, giving it what is appropriate, in amount, and with repetition at such times and to such extent as may be dictated by his knowledge and experience;" and after stating Bigelow's and Dunglison's definition of medicine, held that the practice of osteopathy was the practice of medicine. We need only add that our statutes are not so materially different from the statute construed in that case as to impair the decision of it, in any degree, as an authority directly upon the question in hand. So, also, is the case of *Little v. The State,* 51 L. R. A. 717, being an osteopathy case, directly in point. See also *Underwood v. Scott* (Kan.), 23 Pac. Rep. 942; *Jones v. People,* 82 Ill. App. 453; *People v. Gordon,* 62 N. E. Rep. 858.

We have examined the cases relied upon by appellant. Some of them are perhaps in point, but are opposed to our view of the law.

The next point we shall consider is the one assailing the constitutionality of these statutes. We need but to refer to the following cases and the reasoning em-

[Bragg v. The State.]

ployed in them to uphold the constitutionality of this legislation: *Brooks v. State*, 88 Ala. 122; *Stough v. State, Ib.* 234; *Bell v. State*, 104 Ala. 79; *Nicholson v. The State*, 100 Ala. 132; *Hewitt v. Charier*, 16 Pick. 353; *Dent v. West Virginia*, 129 U. S. 114; *Alopathic State Board, etc., v. Fowler*, 24 So. Rep. 809; *Harding v. People*, 15 Pac. Rep. 727; *State v. Webster*, 41 L. R. A. 212, and cases cited on page 217.

So, likewise, the contention that the associations and boards of censors are not regularly organized under the constitution of the "Medical Asociation of the State of Alabama" is untenable. It is enough that the boards of examiners are *de facto* acting under the provisions of the statutes and that its certificate of qualification would protect defendant from prosecution for a violation of the criminal statute.

The remaining insistence relied on, rather as an excuse or palliation for a violation by defendant of the law, is no justification or excuse at all. It is, that the boards of examiners, as presently constituted, discriminate in favor of those physicians who practice the regular system of medicine against all who practice other systems or belong to other schools. If it be conceded that this fact is shown by the record, it furnishes to defendant no right to violate the criminal laws of the State. His remedy is by proper procedure in the civil courts, in the event his application for license is rejected. It strikes us that this defense is an afterthought. The record does not even hint at any attempt on the part of the defendant to procure a license. He rather chose to construe the law to suit his own notions and engaged in the practice of medicine without even making any effort whatever to comply with its mandates or even to have the unjust discrimination of which he complains removed before engaging in the practice.—*Dent v. West Virginia, supra; Harding v. People, supra; Alopathic State Board, etc., v. Fowler, supra; Iowa Asso. v. Schrader*, 20 L. R. A. 355.

The defendant was properly convicted.

Affirmed.