(117 App. Div. 546)

## PEOPLE v. ALLCUTT.

(Supreme Court, Appellate Division, First Department.   February 8, 1907)

PHYSICIANS AND SURGEONS—PRACTICING MEDICINE—LICENSE.

  Laws 1893, p. 1547, c. 661, § 153, provides that any person who, not be-
ing then lawfully authorized to practice medicine within the state, and so
registered according to law, shall practice medicine within the state with-
out lawful registration, shall be guilty of a misdemeanor.   Defendant,
who was not registered, held himself out by a sign and card as a doctor,
with office hours. He prescribed no drugs, but consulted with his patients,
diagnosed their ailments, prescribed diet, conduct, and remedies, and gave
treatment by manipulation with the fingers, professing to cure without
drugs all diseases that physicians could cure with drugs and others that
they could not cure, taking payment for his services.   Held, that defend-
ant was practicing medicine, in violation of the statute.

Appeal from Court of Special Sessions, New York County.

E. Burton Allcutt was convicted of practicing medicine without
being lawfully authorized and registered, in violation of Laws 1893, p.
1547, c. 661, § 155, as amended by Laws 1895, p. 257, c. 398, and he
appeals.   Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGH-
LIN, CLARKE, and SCOTT, JJ.

Black, Olcott, Gruber & Bonynge (Terence J. McManus, of coun-
sel), for appellant.

William Travers Jerome, Dist. Atty. (Robert C. Taylor, of coun-
sel), for the People.

CLARKE, J.   The evidence tended to establish that, in the win-
dow of the defendant's residence, was exhibited a sign:   "Dr. E. Bur-
ton Allcutt, Mechano-Neural Therapy."   That on the bell outside the
door was the name "Dr. Allcutt."   That, in the office building on Twen-
ty-Second street in which the defendant had an office, there appeared
upon the directory in the hall, "Dr. E. Burton Allcutt."   That he had
and distributed a card reading:   "Phone 3192 Riverside.   Dr. E.
Burton Allcutt, mechano-neural therapy.   27 East Twenty-Second
street, room 55; office hours, 9–12 a. m.   336 West 95th Street; office
hours, 2–6 p. m. New York City."   That his receipt for services render-
ed was signed "Dr. E. Burton Allcutt."   That the complaining witness
visited the defendant at the office address given.   That defendant said
that he was Dr. Allcutt, "I usually see all my patients up town in the
afternoon, and I am down in this office in the morning."   That, the
witness having said that she was troubled with severe headaches, was
nervous, and had frequent spells of vomiting, the defendant told
her he wished her to remove her corsets in order to examine her
thoroughly to find out what her trouble was.   He examined her chest,
heart, and back by placing his ear to her heart.   He tapped with his
fingers.   That the witness said:   "Doctor, I also have a very severe
pain in my left arm.   Do you think it is rheumatism?"   He said:
"You are entirely too young to have rheumatism.   It is from your
stomach.   You have malaria and stomach disease."   She said to him:
"Can you cure me?"   The defendant said:   "Certainly I can.   You

will have to take 12 treatments, which will cost $25 in advance." That he said he gave no medicine at all, but quieted the nervous system. That the defendant was asked if he called at patients' residences. That he replied: "Certainly. As she resides in the Bronx I would have to charge her $5 a visit." Witness said: "Doctor, can you cure all kinds of diseases without drugs?" He said: "Yes; I find I can cure without drugs. I can cure all diseases that any physician can cure without drugs, and also diseases that they cannot cure with drugs." He said that he had practiced medicine; that he had given up drugs; that he could cure anything that physicians cured; and that she then paid $5 for the examination and received a receipt. That subsequently the defendant called at her residence in response to a telephone call. That witness told him that she felt ill all day, that she had a chill, and had been vomiting, had a pain in the region of her abdomen. That defendant took hold of her hand, felt of her pulse, looked at her tongue, examined her throat, and said: "It is all from your stomach. I want you to drink a quantity of lukewarm water with salt in it." He gave it to her in spoonfulls. He said: "You must not eat pork or potatoes or any kind of sweets." And then said: "I will give you a treatment."

Witness testified that defendant started to treat her back with his fingers. He said he was treating her nerves. He treated her spine by putting the fingers upon her spine, the ends of the fingers, a touching sensation, nothing like kneading. He did this for about an hour. He varied that treatment, on the neck, breast, heart, and stomach in the same way, just by his fingers. He advised her, in case she had pains in the night, if the pains in her abdomen were severe, to place an ice bag on it and one on her feet, and, if her bowels troubled her, to place a hot water bag on her back and go to bed, not to lie on the couch, and if she got any worse to send for him. That her husband said to him: "Doctor, what are you doing?" He replied: "I am treating her nerves. Don't you see how quiet she is now?" And that $5 was paid for that visit. The witness testified that, as a matter of fact, there was nothing the matter with her, and that she was acting during these interviews as a detective.

The defendant in his own behalf testified that he practiced the art of mechano-neural therapy, and that he was a graduate of the College of Mechano-Neural Therapy of Atlantic City, N. J., having received its diploma on the 1st of November, 1902. It was conceded that the College of Mechano-Neural Therapy was not recognized by the regents of the state of New York, and that a diploma of that institution will not give the right to practice, nor to an admittance to an examination to determine the fitness of such a person to practice medicine, and that defendant was not registered as a physician in the county of New York. The defendant testified: "I started into the practice of this profession on the 11th day of November, 1902, at the present address. I have practiced ever since in the city of New York and elsewhere." That prior to his attendance at said college he had been practicing massage, and was a graduate of the Mills Training School, attached to Bellevue Hospital, and had engaged in his profession as a nurse. That the statement of the complaining witness was substan-

tially correct. That he had not studied medicine, except from the standpoint of a nurse. That mechano-neural therapy means mechanical nerve treatment, a gentle pressure on all parts of the body. That the whole theory of this science is that disease comes from the lack of blood circulation, and that the treatment proceeds upon' the theory of assisting the circulation back into the normal condition.

The defendant was convicted of the crime of practicing medicine without being lawfully authorized and registered.

The contention of the appellant is that, conceding all the facts proved, he was not guilty of the crime charged, inasmuch as he was not practicing medicine within the meaning of the statute, in that he neither gave nor applied drugs or medicines, nor used surgical instruments. Section 153 of. the public health law (chapter 661, p. 1547, Laws 1893) provides as follows:

"Any person who, not being then lawfully authorized to practice medicine within this state and so registered according to law, shall practice medicine within this state without lawful registration, * * * shall be guilty of a misdemeanor."

To confine the definition of the words "practice medicine" to the mere administration of drugs or the use of surgical instruments would be to eliminate the very cornerstone of successful medical practice, namely, the diagnosis. It would rule out of the profession those great physicians whose work is confined to consultation, the diagnosticians, who leave to others the details of practice. Section 146 (page 1543) of the public health law provides that persons desiring to practice medicine must pass a regents' examination, made up of "suitable questions for thorough examinations in anatomy, physiology and hygiene, chemistry, surgery, obstetrics, pathology and diagnosis and therapeutics, including practice and materia medica." Diagnosis would therefore seem to be an integral part of both the study and practice of medicine, so recognized by the law as well as common sense. The correct determination of what the trouble is must be the first step for the cure thereof. It is a well-known fact that the disease popularly known as consumption may, if discovered in time, be arrested, if not entirely eradicated from the system, by open-air treatment in the proper climate, and that in such cases use of drugs has been practically given up. Would the physician, in such a case, who by his skill discovered the incipient disease, advised the open-air treatment, and refrained from administering drugs, not be practicing medicine? It may be difficult by a precise definition to draw the line between where nursing ends and the practice of medicine begins, and the court should not attempt, in construing this statute, to lay down in any case a hard and fast rule upon the subject, as the courts have never undertaken to mark the limits of the police power of the state, or to have precisely defined what constitutes fraud. What the courts have done is to say that given legislation was or was not within the limits of the police power, or that certain actions were or were not fraudulent.

The appellant relies upon the case of Smith v. Lane, 24 Hun, 632, decided by the General Term in May, 1881. That case was an action brought to recover the price which it was alleged the defendant agreed

to pay the plaintiff for the treatment of himself and his wife for certain bodily disabilities. It consisted entirely of manipulation of the hands. It was performed by rubbing, kneeding, and pressure. The evidence given by the plaintiff was to the effect that he was employed by the defendant to perform these services for a specific consideration, and that he had performed them until the amount due to him was the sum of $149. The referee dismissed the complaint because it appeared that the plaintiff was not a graduate of any medical school, and had no license permitting him to practice either medicine or surgery. Mr. Justice Daniels, in writing for a reversal of this judgment, said:

"The act did not in terms prohibit any person from following an occupation of this description, and, without some prohibition, it would seem to be as lawful as any other in which one person might render services at the request of and for the benefit of another. * * * The practice of medicine is a pursuit very generally known and understood, and so also is surgery. The former includes the application and use of medicines and drugs for the purpose of curing, mitigating, or alleviating bodily disease; while the functions of the latter are limited to manual operations usually performed by surgical instruments or appliances. * * * What he did in no just sense either constituted the practice of medicine or surgery. He neither gave nor applied drugs or medicine or used surgical instruments. He was outside of the limits of both provisions; and neither one of the schools or societies mentioned in the act had jurisdiction over him or had authority to restrain, restrict, or prevent him in the occupation he was engaged in following. While his services may have offered no benefit to the persons receiving them, he was not prohibited from performing them by anything in this act, and no other law was violated by him which the evidence tended to show had been entered into."

It will be noted that that was a private action between the parties to a contract, for services rendered, and that the public were not represented.

We do not consider the remarks of the learned judge, above quoted, as being an exhaustive or exclusive definition of the term "practice of medicine." In the same volume in which Smith v. Lane was reported appears the case of Grattan v. Metropolitan Life Ins. Co., 24 Hun, 43, where the question of the admissibility of the evidence of a physician under section 834 of the Code of Civil Procedure was under consideration. The physician did not prescribe, but took a sufficient diagnosis to enable him to prescribe. His evidence having been admitted over objection, Learned, P. J., in writing for reversal, said:

"The defendant insisted that there was no relation of physician and patient * * * because G. did not consult him as to a prescription, and the doctor did not prescribe; but the day has passed when it was thought that a physician's advice was of no use unless he ordered a dose of medicine. * * * Next, the defendant insists that the doctor did not act in a professional capacity because he gave no prescription and no advice; but it is plain enough that there are cases where a physician could examine a patient and see that medicine will do no good, and that there is no advice to give him except just what the doctor gave to G., to make the best of the present because he would not remain here very long."

The appellant cites five cases in other states as in harmony with Smith v. Lane, supra. State v. Liffring, 61 Ohio St. 39, 55 N. E. 168, 46 L. R. A. 334, 76 Am. St. Rep. 358, was under the peculiar language of the statutory definition which was held to require the use of drugs in order to constitute the practice of medicine. There was subsequently

an amendment of the Ohio statute, and the subsequent cases of State v. Gravett, 65 Ohio St. 289, 62 N. E. 325, 55 L. R. A. 791, 87 Am. St. Rep. 605, and State v. Marble, 72 Ohio St. 21, 73 N. E. 1063, 70 L. R. A. 835, 106 Am. St. Rep. 570, were decided the other way. State v. Herring, 70 N. J. Law, 34, 56 Atl. 670, was also decided upon the wording of the statute. Nelson v. State Board of Health, 57 S. W. 501, 50 L. R. A. 383, a Kentucky case, and State v. McKnight, 131 N. C. 717, 42 S. E. 580, 59 L. R. A. 187, are not entitled to be considered authorities in this jurisdiction, inasmuch as they proceed upon the proposition that in those states it would be unconstitutional for the Legislature to limit the right to practice medicine—a doctrine counter to that held in the rest of the Union. There remains but one case, that of State v. Mylod, 20 R. I. 632, 40 Atl. 753, 41 L. R. A. 428, a case of a Christian Scientist. The court pointed out that, not only the defendant did not attempt to treat disease, but he denied its very existence. In contrast with this last case is People v. Pierson, 176 N. Y. 201, 68 N. E. 243, 63 L. R. A. 187, 98 Am. St. Rep. 666. Pierson believed in "Divine Healing." His child had catarrhal pneumonia and died. Pierson did not call in a physician, but believed the child could be cured by prayer. He was convicted, under section 288 of the Penal Code, for willfully omitting to furnish "medical attendance" to the child. Judge Haight concludes that the medical attendance required by the provision of the Penal Code could be furnished only by a physician duly authorized to practice under the public health law, and the conviction was sustained.

As opposed to the cases following Smith v. Lane, the courts of Massachusetts, Maine, Michigan, Iowa, Missouri, Colorado, Nebraska, Illinois, Ohio, Alabama, Indiana, New Mexico, South Dakota, and Tennessee refuse to restrict the "practice of medicine" to the administration of drugs or the use of surgical instruments. In Bragg v. State, 134 Ala. 165, 32 South. 767, 58 L. R. A. 925, decided in June 1902, upon provisions of the Civil Code of 1896, of that state (sections 3261–3266) and of the Criminal Code of 1896 (section 5333), in effect identical in language with the provisions of the statutes of this state, the court, in a most exhaustive and instructive opinion, declared that both the man who used and the man who did not use drugs were yet engaged in the art of healing and curing human diseases; that the purpose of the medical law was to protect the public against charlatanism, ignorance, and quackery; and that it was not the legislative intent to restrict the examination of those desiring to practice medicine to that class of the profession who may prescribe drugs. In that case, and in the note to O'Neill v. State (Tenn.) 90 S. W. 627, 3 L. R. A. (N. S.) 762, may be found collected the cases in the several states, as indicated supra, which did not follow the definition of practice of medicine as limited and restricted in Smith v. Lane.

We are of the opinion, from the general current of the authorities throughout the country, and from examination of the history and growth of our own public health statutes, that we should not apply the rule as claimed to have been laid down in Smith v. Lane. When we find, as in this case, a defendant holding himself out by sign and card as a doctor, with office hours, who talks of his patients and gives

treatments, who makes a diagnosis and prescribes diet and conduct and remedies, simple though they be, and who asserts the power to cure all diseases that any physician can cure without drugs, and also diseases that they cannot cure with drugs, and who takes payment for a consultation wherein there was an examination and determination of the trouble, that is, a diagnosis, as well as payment for subsequent treatment, even if no drugs are administered, we must hold that he comes within the purview of the statute prohibiting the practice of medicine without being lawfully authorized and registered.

The judgment of conviction should therefore be affirmed. All concur.