ROSE ENGEL, Respondent, v. MOLLIE GERSTENFELD, Appellant.

(Supreme Court, Appellate Term, Second Department, December, 1917.)

Medical services — when recovery cannot be had for — meaning of "deformity " — physicians — statutes — Public Health Law, § 160(7).

Superfluous hair on the face is a " deformity " within the meaning of section 160(7) of the Public Health Law (Laws of 1909, chap. 49), and one who, not being a licensed and registered physician, holds herself out as being able to successfully treat such a deformity and undertakes to treat it with an electric needle violates the provisions of the statute regulating the practice of medicine and, as under section 174 of the statute she is guilty of a misdemeanor, she cannot recover for services rendered in giving such treatments.

CALLAGHAN, J., dissents.

APPEAL by defendant from a judgment of the Municipal Court of the city of New York, borough of Brooklyn, first district, rendered September 22, 1917, in favor of the plaintiff for $246.75 damages and costs, after a trial by the court without a jury.

Meyer Krauschaar, for appellant.

Alexander S. Drescher and Noah Seedman, for respondent.

BENEDICT, J.   This action was brought to recover a balance alleged to be due on a contract for " professional services."   Plaintiff testified that she had been engaged for three years in the business of the removal of superfluous hair from women's faces by the use of an electric needle, and that her office was at 16 Court street, Brooklyn.   She claims that on January 5, 1917, the defendant called at her office, accompanied by one

Pearl Abrams, defendant's niece, and that thereupon a contract was made between plaintiff and defendant whereby plaintiff was to give said Pearl Abrams treatments, for the removal of superfluous hair from her face, for three months, at $2.50 per hour, which defendant promised to pay. The treatments began on January 7, and continued on nearly every day until about July 13, 1917, each treatment occupying from one to four hours. At the end of the first three months defendant, in company with her niece, again called on the plaintiff, and, according to the plaintiff, paid $200 on account and arranged for three months' further treatment, promising to pay the balance of $60 then owing when she paid for the second three months' treatment. The plaintiff thereupon continued the treatment and has sued for the balance, due, viz., $223.75.

Defendant's story, which is corroborated by Miss Abrams, who was of full age at the time of the transaction, is that the contract was not made by her but was made between the plaintiff and Miss Abrams, and that the defendant never undertook to pay for the treatments and never did pay for any part of them, the $200 and $25 paid at another time having been paid by Miss Abrams herself.

The question as to whether the defendant or the niece made the contract was a question of fact for the trial justice, who had the opportunity, which we have not, of seeing the witnesses, and I think his conclusion as to the facts was fully justified by the recorded evidence. Indeed, from a perusal of the record, I cannot see how any other conclusion could have been reached upon that part of the case.

A more serious difficulty in sustaining the judgment is encountered, however, when we consider the defendant's contention that the plaintiff, not being a licensed

and registered physician, in undertaking to treat Miss Abrams for the growth of hair on her face, violated article VIII of the Public Health Law regulating the practice of medicine. The practice of medicine is defined in the act as follows: " A person practices medicine within the meaning of this article, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition." Public Health Law (Laws of 1909, chap. 49), § 160, subd. 7.

The growth of hair on Miss Abrams' face when she went to plaintiff was a " deformity " or a " physical condition," for which she, or the defendant, desired the aid of the plaintiff in the treatment and cure; and plaintiff clearly held herself out to them as being able to treat it successfully, and did undertake to treat it with an instrument known as an electric needle.

The plaintiff's counsel argues that in order to constitute a violation of the statute there must be shown to have been a " holding out " by the party that he or she is practicing medicine. I assume that he is right in this contention and I think there was such evidence. On direct examination the plaintiff testified that the defendant was recommended to her by a personal friend of the plaintiff and asked whether the plaintiff would agree to undertake to work on her niece's face, and that plaintiff said she would. Then the defendant asked about her work and her rates. On cross examination plaintiff testified that " I told Mrs. Gerstenfeld that there will be a decided improvement at the end of three months." And again she made the following answers: " Q. You know the fact that she had

Appellate Term, Second Department, December, 1917.   [Vol. 102.

so much hair on her face is the result of a diseased con-
dition of the skin? A. It is what most people call a
disease. Q. And you undertook to cure a diseased
condition of the skin so that the hair wouldn't grow
again? A. Why, certainly."

The statute plainly means that a person holds him-
self out as being able and willing to diagnose or treat
any human disease or "deformity" or "physical
condition" when he represents or states to a patient
that he possesses the skill or ability requisite for the
case.   It is not essential that the "holding out"
should be by way of public announcement. If there be
a "holding out" of oneself as willing to undertake the
treatment and able to administer it, then it follows
that this constitutes the practice of medicine within the
terms of the statute.

The plaintiff also urges that the removal of hair
from the face of a women by the use of an electric
needle does not properly come within the category of
the practice of medicine any more than the removal of
hair from the face of a man by the use of a razor
would; but the analogy is not correctly drawn. The
plaintiff held herself out as being able to cure an
abnormal or unusual condition of the skin — whether
due to disease or not is immaterial — by the use of elec-
tricity in such a manner that the hair would not grow
out again. In other words, she claimed to be able to
destroy the roots of the hair so that it should not reap-
pear upon the face of the patient. In order to accom-
plish this she  had to perforate the skin with a needle
charged with electric current. She might have used a
razor upon the surface of the face, but that remedy
would have afforded only temporary relief for the
unusual and unfortunate condition. Had she pulled the
hairs out they would have grown again if there was life
in the root. It was the claim that her special form of

pathological treatment would produce lasting results by destroying that life that led the defendant to her and prompted her to agree to pay at the rate of two dollars and fifty cents for each hour's attention.

The skin is the covering of the whole body. It acts firstly, as a protective layer, secondly as a regulator of the temperature, thirdly as an excretory organ, and fourthly as a tactile and sensory organ in which nerves end. It varies in thickness over different parts of the body. Two main layers are recognized in the skin; the epidermis' or scarf skin, and the dermis or true skin. Owing to its formation it is liable to the same pathological conditions as other structures of the body; such for example as inflammations or the results of irritant poisons.

Hair is an appendage of the skin. It grows at its roots from a hair follicle which is a tubular inpushing of the epidermis into the true skin or dermis, or, in the case of large hairs, deeper still into the superficial fascia. It is divided into an inner and outer root sheath, the former representing the more superficial layers of the epidermis, the latter the deeper layers. At the bottom of the follicle the hair enlarges to form the bulb, and into the lower part of this a vascular papilla projects from the true skin. The cells of the hair are derived from, and are continuous at the bulb with those of, the outer root sheath, and therefore with the deeper layers of the epidermis. See article on Skin in Encyc. Brit. 11th edition.

Anthropology has pointed out the obvious racial differentiation in the hair of different races of mankind. In most Caucasian races hair does not usually grow upon the faces of women, just as in the yellow races the men often have only rudimentary beards. When hair appears upon the face of a woman of the European races in noticeable quantity or strength it is

regarded as an abnormal and unfortunate physical condition amounting to a deformity, and much study has been employed in scientific attempts to ameliorate the unwelcome condition without danger to the individual. Among these is the use of an electrically heated needle, introduced under the epidermis and reaching the root of the hair so as to destroy its life. The process is obviously one requiring a knowledge of the structure and pathological condition of the skin and involving some risk of scarifying the skin by the application of too great a degree of heat. This is shown by the plaintiff's own testimony when she said: " The hairs that I removed stayed out with the exception of a few that were entirely too heavy to be taken out with one application of the electric current; if I had used the amount of current required I would probably have scarred her face."

In so far as my research has disclosed, there has been no case precisely similar to the instant case decided by the courts of this state. Bouvier, speaking of surgery, says: " The practice of surgery is limited to manual operations usually performed by surgical instruments or appliances." Bouvier's L. Dict.

The use of an electrical needle would obviously come within this definition. It is a matter of common knowledge that in modern surgery frequent use is made of an electrically heated needle or wire for the purpose of treatment or cauterizing of the throat, nose and other parts of the body. Such a use by a person of inexperience would naturally be attended with some danger to the patient. In *Davidson* v. *Bohlman,* 37 Mo. App. 576, it was held under a statute prohibiting the practice of medicine without a license that it is not necessary that internal remedies be administered; they may be applied externally and they need not necessarily be substances

which may be seen or handled. Thus one giving electrical treatment is practicing medicine.

The plaintiff urges that the treatment given by her does not come within the purview of the Public Health Law any more than would be the case if she employed what is known as massage; but it is obvious that the manipulation or rubbing or kneading of the surface of the body as used in massage is quite distinct from the treatment which the plaintiff gave. It is true that the General Term of the Supreme Court in the case of *Smith* v. *Lane,* 24 Hun, 632, held that the practice of massage was not prohibited by the statute then in force regulating the practice of medicine, and that it was merely a species of nursing; but the rule laid down in that case was strongly criticised in the case of *People* v. *Allcutt,* 117 App. Div. 546, where it was held that it was not necessary either to administer medicine or to use surgical instruments in order to come within the provisions of the Public Health Law. In the case of *Territory* v. *Newman,* 79 Pac. Rep. 706, 813, it was held by the Supreme Court of New Mexico, in a well-considered opinion, that even the method of treatment employed in that case, which was known as " magnetic healing," given by a man who advertised himself as a " drugless doctor," came within the prohibition of the statute of that state.

In the case of *People* v. *John H. Woodbury Dermatological Institute,* N. Y. L. J. Jan. 15, 1908, where the Court of Special Sessions of the city of New York held the defendants, a corporation and its president, guilty of advertising to practice medicine within the meaning of Laws of 1907, chapter 344, which contained in section 15 a definition of the practice of medicine similar to that in the present law, the record of the case on appeal shows that one of the deformities which the defendants advertised to cure was superflous hair.

The court, after citing this and some other advertising matter, said: "We do not need the statutory definition to determine that this is advertising ' to practice medicine,' by a nonregistered physician." The conviction was affirmed by the Appellate Division (124 App. Div. 877) and by the Court of Appeals (192 N. Y. 454).

The recent case of *People* v. *Cole,* 219 N. Y. 98, is also authority for the proposition that the statute applies to " every means and method that could * * * be used or claimed to be used to relieve or cure disease and infirmity," unless such means or method is within the exceptions contained in section 173 of the Public Health Law. It is not contended that the plaintiff in the instant case is within any of these exceptions.

The statute further provides that any person who shall practice medicine without license and registration or in violation of the provisions of the article shall be guilty of a misdemeanor. Pub. Health Law, § 174.

The definition of the term " practice of medicine " contained in the statute and quoted above may be thought by some persons to be highly artificial. It includes, and was designed to include, many things not popularly considered as medical practice. But the wisdom of the law, if it be constitutional (and its constitutionality is not attacked in this case), is a matter for the consideration of the legislature and not of the courts. Courts have no function in the matter of the wisdom of legislative enactments. Their duty is confined to the interpretation of the laws or, in proper cases, to the determination of their constitutionality. It may well be argued that four years of medical study, including a thorough knowledge of anatomy, materia medica, hygiene, etc., in all their branches, are not requisite to equip a person properly to remove superfluous hair alone. Yet it can hardly be contended that

persons engaging in that occupation should not be subject to some sort of regulation to insure proper skill and sanitation, such at least as the regulations affecting the practice of chiropody. Pub. Health Law, art. XIII. The legislature has seen fit to set a much higher standard, as I have attempted to show, and until the statute herein discussed is amended or abrogated the courts have no discretion but to enforce it.

As the plaintiff committed a misdemeanor in undertaking to treat the " deformity " or " physical condition " of the skin of Miss Abrams, she, the plaintiff, was not entitled to recover in this action. *Fox* v. *Dixon,* 34 N. Y. St. Repr. 710; *Accetta* v. *Zupa,* 54 App. Div. 33; and see note to that case in 8 N. Y. Anno. Cases, 190, in which there is a full discussion of the right to recover compensation in the absence of registration. See also *Ottaway* v. *Lowden,* 55 App. Div. 410.

I advise that the judgment be reversed, with costs, and the action remanded to the court below with directions to dismiss the complaint.

CLARK, J., concurs in the result, on the ground that the plaintiff practiced medicine in that (following the definition of the statute) she held herself out as being able to diagnose, treat and operate for a certain physical condition, and undertook to diagnose, treat and operate for such physical condition.

CALLAGHAN, J. (dissenting). In order to hold that this plaintiff was practicing medicine within the meaning of the statute (Pub. Health Law, § 160) we must find that she held herself out as a practitioner and as one who was able to diagnose and cure " disease," " deformity " or a " physical condition." There is nothing in this record to indicate that plaintiff held herself out as being able to diagnose any of these con-

ditions. When the defendant called upon plaintiff to have the hair removed from the face of Miss Abrams all the parties must have known the condition of the woman's face and understood, in some respect, the method to be adopted in removing the alleged superfluous hair. No representations were made by this plaintiff. Concededly there is nothing in the record to show that the growth of hair on a woman's face is a disease. The question then arises: Was it a " deformity " within the meaning of the statute? The Century Dictionary describes a " deformity " as a " deformed or misshapen condition; an unnatural growth, or a distorted or misshapen part or member; disfigurement; as a bodily deformity." The statute does not state or contain a definition of any of these words. The presumption, therefore, is that they were used in their ordinary sense, and with their ordinary intent. A growth of hair on a woman's face can certainly not be a " deformed or misshapen condition." In considering the second meaning given, viz., " an unnatural growth or a distorted or misshapen part or member," the words " unnatural growth " cannot but pertain to matters that are *ejusdem generis,* when joined with the expression " or a distorted or misshapen part or member," common sense dictating to us that in the ordinary acceptation of such terms reference must naturally be to a physical growth or deformity, such as a web foot or a hunch back. Proceeding to the third meaning given by the Century Dictionary we find, that the word " disfigurement " is stated to be " the state of being disfigured," *i. e.,* " physically marred in any manner." It would clearly be absurd for us to say that " physically marred " would be applicable to the case at bar.

I am not satisfied that the unnatural growth of hair on a woman's face is a deformity within the common definition of that word. Had the plaintiff adopted the

same means in removing the hair in question as are commonly used by a barber in shaving a man, it could hardly be argued that she would be guilty of practicing medicine, in that she attempted to treat a deformity. The word " deformity " in the statute evidently means some unnatural or misshapen condition of the body, and should not be so technically interpreted by us as to mean that the growth of hair on a woman's face is a deformity. Was this a " physical condition " within the meaning of the statute? A physical condition is, I take it, any condition that is perceptible by the senses. Therefore, a physical condition is anything or any condition about the body which is the subject of observation. It could very forcibly be argued that the growth of a finger nail, or premature baldness, or a visible birthmark, or any growth upon the body is a physical condition, but the legislature, I am sure, did not intend that such an interpretation should be put upon these words. It is quite as logical to say that a manicure or a barber is guilty of practicing medicine without a license in removing parts of the finger nail or the hairs on a man's face, as this plaintiff is in removing hair from a woman's face.

The judgment is proper and should be affirmed, with costs.

Judgment reversed, with costs.